

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MOHAMMED TARIQ AMIN,<br><br>Defendant. | No. 1:20-cr-256<br><br>Count 1: Conspiracy to Offer and Pay Health Care Kickbacks (18 U.S.C. § 371)<br><br>Count 2: Conspiracy to Commit Health Care Fraud (18 U.S.C. § 1349)<br><br>Criminal Forfeiture |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### General Allegations

At all times material to this Criminal Information:

1. Mohammed Tariq Amin ("AMIN") has been a licensed pharmacy technician in the Commonwealth of Virginia since in or around March 2007. From on or about January 2015 to on or about January 2016, AMIN served as a pharmacy technician at MEDEX HEALTH PHARMACY ("MEDEX HEALTH"), which was located in Falls Church, Virginia in the Eastern District of Virginia. From on or about January 2016 to on or about November 7, 2018, AMIN served as the general manager at ROYAL CARE PHARMACY ("ROYAL CARE"), which was located in Fairfax, Virginia, in the Eastern District of Virginia. As the general manager at ROYAL CARE, AMIN was responsible for overseeing, controlling, and managing the day-to-day operations of the pharmacy.

2. Mohamed Abdalla ("Abdalla") was a pharmacist licensed in the Commonwealth of Virginia. Abdalla owned and operated MEDEX PHARMACY ("MEDEX"), MEDEX HEALTH,

MEDEX HEALTH GROUP, LLC, ("MEDEX HEALTH GROUP"), which did business as ROYAL CARE, MILLENNIUM PHARMACY ("MILLENIUM"), and PHARMACY AT GREAT FALLS ("GREAT FALLS"). Finally, ABDALLA operated LANGLEY PHARMACY ("LANGLEY"). All of these pharmacies were located in the Eastern District of Virginia. While in operation, these pharmacies filled prescriptions for patients' medications that were prescribed by numerous doctors and that were billed to various health insurance benefit programs.

3. Since in and around July 2018, Onkur Lal ("Lal") has been a licensed pharmacist with the Commonwealth of Virginia. Prior to becoming a pharmacist, from in and around 2013 to in and around 2015, Lal worked as a pharmacy technician at both MEDEX and MEDEX HEALTH. From in and around 2015 and continuing through at least in and around July 2018, Lal worked as a pharmacy intern at ROYAL CARE. From in and around July 2018 to in and around April 2019, Lal worked as a pharmacist at ROYAL CARE.

4. Since in and around June 2013, Unindicted Co-Conspirator 1 has been a licensed pharmacy technician in the Commonwealth of Virginia. From in and around 2015 and continuing through at least in and around April 2019, Unindicted Co-Conspirator 1 was the laboratory manager and compounding technician at ROYAL CARE. Unindicted Co-Conspirator 1 had a managerial role at GREAT FALLS.

5. From in and around 2015 to in and around 2017, Dan Walker ("Walker") worked as a medical sales specialist for Pharmaceutical Company A, which is headquartered in the Eastern District of Virginia. Walker was responsible for marketing a naloxone auto-injector device used for the treatment of an opioid emergency. Walker marketed this naloxone auto-injector device to health care providers and pharmacies, such as ROYAL CARE.

6. Medicare, Virginia Medicaid, Maryland Medicaid, and TRICARE are federal

2

health care programs funded directly, in whole or in part, by the United States Government, or a state health care program, as defined by Title 42, United States Code, Section 1320a-7b(f). Medicare, Virginia Medicaid, Maryland Medicaid, and TRICARE are also federal health care programs as defined by Title 18, United States Code, Section 24(b).

7. "Compounding" a prescription is a practice in which a licensed pharmacist or licensed physician combine mixed or altered ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient where standard medications, approved by the United States Food and Drug Administration ("FDA") are unsuitable due to patient allergies, intolerance to method of administration, or other uncommon factors. Compounded medications are prescribed and mixed for specific patients with particular needs; they are not to be mixed and marketed in bulk quantities. Compounded drugs are not FDA-approved. That is, the FDA does not verify the safety, potency, effectiveness or manufacturing quality of compounded drugs.

8. In general, compounded drugs are far more expensive than drugs approved by the FDA for the treatment of the same physical condition and are commonly reimbursed by Federal health care programs and private insurance companies at a far higher rate than FDA-approved drugs.

## COUNT ONE

*(Conspiracy to Offer and Pay Health Care Kickbacks)*

9. The General Allegations are re-alleged and incorporated by reference.

10. From a date unknown, but by at least in and around August 2016 and continuing through at least in and around February 2018, in the Eastern District of Virginia and elsewhere, Mohammed Tariq Amin knowingly and willfully did combine, conspire, confederate and agree with Mohamed Abdalla, Dan Walker, and others known and unknown, to commit the following offense against the United States, that is, the violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind to induce pharmaceutical sales representatives to direct health care providers and other individuals to send prescriptions to ROYAL CARE for the furnishing of items and services for which payment may be made in whole or in part under a federal health care program.

### Purpose of the Conspiracy

11. It was the purpose of the conspiracy for Mohammed Tariq Amin ("AMIN"), Mohamed Abdalla ("Abdalla"), Dan Walker ("Walker"), and their co-conspirators to unlawfully enrich themselves.

### Ways, Manner, and Means

The ways, manners, and means by which AMIN and members of the conspiracy sought to achieve the purpose of the conspiracy included, but were not limited to, the following:

12. It was part of the conspiracy for AMIN, Abdalla, and their co-conspirators to cause kickbacks to be paid to pharmaceutical representatives, including Walker, in exchange for these

representatives referring doctors who would direct prescriptions for certain drugs to be filled through ROYAL CARE.

13. It was further part of the conspiracy that AMIN, Abdalla, and their co-conspirators, submitted claims to federal health care programs for reimbursement for prescriptions that were directed to, and billed by, ROYAL CARE as a result of Walker's marketing efforts.

14. It was further part of the conspiracy that AMIN, Abdalla, and their co-conspirators used various means to disguise the kickback payments.

## Overt Acts

In furtherance of the conspiracy, and to effect the objects thereof, AMIN and his co-conspirators committed overt acts in the Eastern District of Virginia and elsewhere, including, but not limited to, the following:

15. From in and around August 2016 through in and around October 2017, in the Eastern District of Virginia and elsewhere, AMIN and his co-conspirators, including Abdalla, made payments to Walker of approximately $573,558.46 from Abdalla's MEDEX HEALTH Group bank accounts in exchange for prescriptions for the naloxone auto-injector device filled by ROYAL CARE.

16. From in and around October 2017 through in and around September 2018, in the Eastern District of Virginia and elsewhere, AMIN and his co-conspirators, including Abdalla, made payments of approximately $132,347 to Walker through AMIN's company, Innovative Pharmacy Solutions LLC, with the intent of concealing the income, in exchange for prescriptions for this naloxone auto-injector device being directed to ROYAL CARE, which the pharmacy filled. AMIN kept for himself a portion of the fees that were intended for Walker pursuant to the kickback arrangement.

17. From in or around June 2017 through in or around June 2018, in the Eastern District of Virginia and elsewhere, AMIN withdrew cash in the amount of approximately $70,823.78 from AMIN's Innovative Pharmacy Solutions LLC bank account and used at least some of it to pay Walker in exchange for prescriptions for this naloxone auto-injector device directed to ROYAL CARE, which ROYAL CARE, MILLENIUM, or GREAT FALLS filled.

18. From on or about August 1, 2016, through on or about February 28, 2018, in the Eastern District of Virginia and elsewhere, ROYAL CARE, MILLENNIUM, and GREAT FALLS, received payments of approximately $8,465,015.29 collectively from Medicare, Virginia Medicaid, Maryland Medicaid, and TRICARE for claims submitted for prescriptions for this naloxone auto-injector device as a result of prescriptions directed to ROYAL CARE pursuant to the kickback relationship with Walker.

(All in violation of Title 18, United States Code, Section 371)

## COUNT TWO

### (*Conspiracy to Commit Health Care Fraud*)

19. The General Allegations are re-alleged and incorporated by reference.

20. From a date unknown, but from at least in or about January 2015 and continuing through at least in or about November 2018 in the Eastern District of Virginia and elsewhere, Mohammed Tariq Amin knowingly and willfully did combine, conspire, confederate and agree with Mohamed Abdalla, Onkur Lal, and others known and unknown, to knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), including, but not limited to Medicare, Virginia Medicaid, Maryland Medicaid, TRICARE, Anthem BlueCrossBlueShield, CareFirst BlueCross BlueShield, Aetna, and United Healthcare, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services, all in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

21. It was the purpose of the conspiracy for AMIN, Abdalla, Lal, and their co-conspirators to unlawfully enrich themselves.

### Ways, Manner, and Means

The ways, manners, and means by which AMIN and members of the conspiracy sought to achieve the purpose of the conspiracy included, but were not limited to, the following:

22. It was part of the conspiracy for co-conspirators to generate false prescriptions using either their own names, the names of other pharmacy employees, or the names of friends

7

and family, for medications which they had no basis to believe were medically necessary and/or which were not authorized by any licensed medical practitioner.

23. It was further part of the conspiracy that the co-conspirators billed health insurance companies for prescriptions that were never filled for existing patients.

24. It was further part of the conspiracy that the co-conspirators billed patients' health care benefits programs for numerous high cost medications that the co-conspirators knew the patients did not need, were not prescribed, and/or never received.

25. It was further part of the conspiracy that the co-conspirators submitted false invoices, under the names of other pharmacies, to circumvent audits conducted of ROYAL CARE.

26. It was further part of the conspiracy that AMIN and Abdalla billed private health care benefit programs for prescriptions the pharmacies were receiving pursuant to a kickback arrangement with Walker.

27. It was further part of the conspiracy that AMIN and Lal fraudulently posed as pharmacists by elevating their title and credentials within the pharmacy's prescription software system.

28. It was further part of the conspiracy that AMIN and Lal used the elevated titles to verify prescriptions, which were then submitted to health care programs and pharmaceutical suppliers for payment.

29. It was further part of the conspiracy that the co-conspirators caused the submission of false, fraudulent, and misleading claims for coupons intended to provide payment benefits/assistance to patients who needed certain pharmaceutical products.

30. It was further part of the conspiracy that the co-conspirators created fictitious patients in the system in order to fraudulently obtain payment for ROYAL CARE pursuant to the

coupon programs.

## Overt Acts

In furtherance of the conspiracy, and to effect the objects thereof, AMIN and his co-conspirators committed overt acts in the Eastern District of Virginia and elsewhere, including, but not limited to, the following:

31. From in and around January 2015 and continuing through at least in and around November 2018, in the Eastern District of Virginia and elsewhere, AMIN, Abdalla, Lal, and Unindicted Co-Conspirator 1, generated false prescriptions using either their own names, the names of other pharmacy employees, or the names of friends and family, for medications that were not medically necessary and/or which were not authorized by a licensed medical practitioner.

32. The co-conspirators were paid approximately $245,069.76 for this scheme for prescriptions that were fraudulently billed.

33. From in and around January 2014 and continuing through at least in and around November 2018, in the Eastern District of Virginia and elsewhere, AMIN and the co-conspirators billed heath care benefit programs for high-cost medications when the patients did not need the prescriptions, the medications were not prescribed, and/or the patients never received the medications.

34. The co-conspirators were paid approximately $4,740,979.62 for this scheme for prescriptions that were fraudulently billed.

35. From in and around August 2016 to in and around February 2018, in the Eastern District of Virginia and elsewhere, CareFirst BlueCross/BlueShield paid the pharmacies $5,643,439.63 for prescriptions for the naloxone auto-injector device that Walker referred to Abdalla's pharmacies as part of the kickback scheme.

36. From in and around August 2016 to in and around February 2018, in the Eastern District of Virginia and elsewhere, Anthem BlueCross/BlueShield paid the pharmacies $2,500,708.68 for prescriptions for the naloxone auto-injector device that Walker referred to Abdalla's pharmacies as part of the kickback scheme.

37. From in and around November 2015 to in and around October 2017, in the Eastern District of Virginia and elsewhere, AMIN and Lal elevated their credentials from pharmacy technician to pharmacist, a license neither of them held at the time in the Commonwealth of Virginia.

38. From in and around November 2015 to in and around October 2017, in the Eastern District of Virginia and elsewhere, AMIN and Lal used their elevated pharmacist titles to verify prescriptions, which were then submitted to health care benefit programs and pharmaceutical suppliers for payment.

39. From in and around November 2015 to in and around October 2017, in the Eastern District of Virginia and elsewhere, health care benefit programs paid approximately $10,196,878 to the co-conspirators, as a result of AMIN and Lal fraudulently posing as pharmacists.

40. From in and around December 2015 to in or around November 2017, in the Eastern District of Virginia and elsewhere, AMIN and the co-conspirators causing the submission of false, fraudulent, and misleading claims for coupons intended to provide payment benefits/assistance to patients who needed certain pharmaceutical products.

41. From in and around December 2015 to in or around November 2017, in the Eastern District of Virginia and elsewhere, AMIN and the co-conspirators created fictitious patients in the RX30 system in order to fraudulently obtain payment for ROYAL CARE pursuant to the coupon programs.

(All in violation of Title 18, United States Code, Section 1349)

## NOTICE OF FORFEITURE

Defendant MOHAMMED TARIQ AMIN is hereby notified, pursuant to Federal Rule of Criminal Procedure 32.2(a), that upon conviction of either of the offenses set forth in this Criminal Information, he shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the violation.

The assets subject to forfeiture include, but are not limited to, the following: a monetary judgment in the amount of not less than $21,510.92, representing the proceeds the defendant obtained from the conspiracies charged in this Criminal Information.

Pursuant to 21 U.S.C. § 853(p), MOHAMMED TARIQ AMIN shall forfeit substitute property, if, by any act or omission of MOHAMMED TARIQ AMIN, the property referenced above cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

(All in accordance with Title 18, United States Code, Sections 982(a)(7) and Fed. R. Crim. P. 32.2.)

          G. Zachary Terwilliger
          United States Attorney

By: _____
       Carina A. Cuellar
       Monika Moore
       Assistant United States Attorneys